BOLIN, Judge.
Robert McMullen appeals, seeking an increase in a judgment for $2500 awarded him by a jury following trial on the merits in his tort action against Charles Pollard and his liability insurer. The sole issue is whether the jury abused its discretion in failing to make a more substantial award. Defendants have neither appealed nor answered the appeal, therefore the question of liability is no longer before us.
Plaintiffs injuries were sustained April 8, 1969, when his. pickup truck was struck from the rear by a vehicle driven by Pollard, causing an iron bar situated directly above and back of the driver’s seat to strike plaintiff on his shoulders. Both drivers-were proceeding south on Southern Avenue in the City of Shreveport, Louisiana. At that time plaintiff was thirty-eight years of age and worked as a mail handler for the United States Post Office.
Within two hours after the accident plaintiff went to the office of Dr. Ray King, orthopedist, for an examination. Dr. King testified McMullen explained the occurrence of the accident and complained of pain in the back of his neck, as well as headache and numbness in the left arm behind the left shoulder. Dr. King’s examination was especially referable to the cervical area and upper extremities in the thoracic spine. He concluded McMullen had received muscular and ligament strains in the posterior cervical region, most marked on the left side; bruises on the back of his left shoulder with some sensory changes in the left arm which he believed resulted from the bruises. Further, Dr. King testified he took X-rays of the cervical spine and also of the left shoulder, which views showed no fractures nor evidence of recent bony trauma. He advised plaintiff to use moist heat to the back of his neck and to rest. He also gave him prescriptions for pain medication and muscle relaxants and advised him to come back within a few days if his symptoms continued. Muscle spasm was defined as an involuntary muscle contraction to prevent motion and prevent the head from being turned, which is a protective mechanism due to pain. The spasm is, in turn, defined as an objective and not a subjective symptom. Plaintiff testified that, immediately following the accident, he missed eighty hours of work from April 8, 1969, until April 25, 1969.
*704 McMullen returned to Dr. King on numerous subsequent occasions, specifically April 10th, 16th and 19th, May 1st and 15th, June 5th, July 1st and 9th, August 18th, 20th and 29th. On each visit he complained of pain in the left shoulder blade, in the back of his neck, and of severe headaches. After more X-rays, which ruled out bone damage, he was advised to continue with moist heat treatments, muscle relaxants and pain killers. During three or four of these visits he received a local anesthetic and cortisone injections. On the last-mentioned visit, August 29th, Dr. King advised him to go into the hospital for a myelogram in order to ascertain if his pain was caused by a ruptured disc or nerve root injury. This McMullen did, and on September 4th the myelogram was performed. Just prior to and during this time plaintiff testified he missed seventy-two hours from work.
The steps involved in the myelogram were described in detail by Dr. King who stated the procedure is considered much more than a minor examination. In the instant case Dr. King administered local anesthetics before injecting the panto-paque, a radiopaque dye, into the spinal canal, from whence it traveled to the base of the brain permitting a fluoroscope or X-ray to reveal, with a fair amount of accuracy, whether there was disc injury or a pinched nerve located within the area of the spinal canal. Findings from this examination were negative.
Following the myelogram it was necessary for the physician again to insert a needle into the spine to withdraw the dye. The first such effort was unsuccessful and a second needle was inserted to withdraw the dye. Each of these procedures was described as painful, and the recuperative period in the hospital was four days, during which the patient suffered severe headaches for which pain' medicine or sedation was required. McMullen was allowed to return home on the fourth day after the myelogram but was confined to his home unable to work from September 3rd to September 23rd because of pain, particularly severe headaches.
On the 19th of September he returned to Dr. King who prescribed physiotherapy. His next visit was November 24th when McMullen complained of persistent discomfort in the upper part of his back, which was making him a “nervous wreck”. Examination revealed the objective symptoms of tenderness and pain were still present. He was seen again on February 13, 1970, still having pain and crepitation (a grinding sound) on motion of the right shoulder and right scapula.
Finally, on Dr. King’s recommendation in August 1970, McMullen went to Dallas where an appointment had been arranged with Dr. Edward M. Krusen, Director of the Department of Physical Medicine and Rehabilitation since 1950 at Baylor University Medical Center in Dallas, Texas. The field of Physical Medicine and Rehabilitation is recognized as a specialty by the Medical Board and Dr. Krusen, who was certified in this area by the board, is admittedly an expert in such field. He performed an electromyogram on the patient. This examination required the use of small needle electrodes inserted in the muscles to measure the time required for conduction of messages along the nerves. Dr. Krusen explained electromyography as a diagnostic procedure to try to discover whether there is nerve damage and, if so, the location and severity of the damage.
The deposition of Dr. Krusen contained a graphic and detailed account of his procedures employed in making the electromy-ogram on plaintiff, as well as his findings, conclusions and prognosis. The entire deposition was read to the jury.
In lay terms he found tightness and involuntary muscle spasm in the right side of McMullen’s neck with pulse changes and slowing through this region of a nerve outlet. From this he concluded the patient did have an “outlet”, which is pressure on a nerve in the neck region, but without compression of the nerve root itself. He *705 testified further that if such pressure on the nerve outlet became chronic and did not respond to treatment, or if it got worse, surgery might be indicated. The two types of surgery which are normally done, according to Dr. Krusen, are sectioning of these muscles in the neck, and more recently one of the more popular procedures had been removal of the first rib to give more room for the nerve outlet region.
Dr. Krusen pointed out that an “outlet” may cause more severe pain than a mild root compression. Although his prognosis was that no surgery was needed, nor would be needed in the immediate future, he qualified this prognosis by saying he did not mean it could not change if he got more findings and if Dr. King felt he had done everything that should be done in the way of a program treating this as an “outlet”. Both Dr. King and Dr. Krusen felt the patient was sincere in his complaints of pain and that such complaints were compatible with their objective findings of muscle, ligament and nerve damage resulting from the accident.
We are mindful of the discretion vested in the lower court by Louisiana Civil Code Article 1934(3) in determining damages in tort cases; nevertheless, we are under a constitutional mandate to review both the law and the facts on appeal. (Louisiana Constitution Article 7, Section 29). Since this was a jury case we have no way of knowing the basis for the decision. From our review of the record, and particularly of the medical testimony, we are convinced a total award of $2500 is so grossly inadequate as to amount to an abuse of discretion. Ballard v. National Indemnity Co. of Omaha, 246 La. 963, 169 So.2d 64 (1964).
We find the evidence supports an award of $5000 for pain and suffering alone. Additionally, McMullen is entitled to recover all special damages occasioned by the accident. The record supports a finding plaintiff lost 174 hours of work at $3.00 per hour, or $522, for which he is entitled to be reimbursed.
Appellants contend they should receive credit for the amount received by McMullen from his employer representing payment for earned sick and annual leave which he had accumulated. That question has been decided adversely to the tort-feasor and in favor of the injured person in numerous Louisiana cases, one of the more recent being Thomas v. Paper Haulers, Inc., (La.App. 2 Cir. 1964), 165 So.2d 61. The rule reiterated there is:
“ * * * It is well settled that the wrongdoer is not entitled to have the damages for loss of earnings and loss of earning power reduced by compensation or pension payments paid to the injured party from a collateral source to which the wrongdoer does not contribute.”
See also Chandler et ux. v. F. Strauss & Son, et al., (La.App. 2 Cir. 1940), 194 So. 133.
The final items of damages, which we think are subject to no dispute, are those for medical expenses, in the amount of $958.82, and the $50 deductible portion of automobile damage paid by plaintiff. However, the proof of loss of earnings from a business of repairing screens, which plaintiff was conducting in his home, is too vague to permit allowance for this item.
For the reasons assigned the judgment of the lower court is amended to increase the award in favor of Robert McMullen from $2500 to the sum of $6,530.82. As thus amended, the judgment is affirmed at defendants’ cost.